**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| JAELE DAVIS, on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>KLOVER HOLDINGS, INC.<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>Case No. 1:26-cv-10593 |

Plaintiff Jaele Davis, on behalf of herself and all others similarly situated, brings this class action suit for damages and equitable relief against Klover Holdings, Inc. ("Klover" or "Defendant"). Plaintiff alleges the following based upon personal information as to allegations regarding herself, and the investigation of her counsel, and on information and belief as to all other allegations:

## NATURE OF THE ACTION

1. This lawsuit seeks to protect Americans from predatory lending practices that violate the Truth in Lending Act, California consumer protection laws, and the California Constitution.

2. Klover markets itself as providing cash to Americans who are struggling to pay rent, pay for gas, or cover the cost of groceries.[1]

3. Users request an advance on their paycheck and shortly after they get paid—usually within the same day—Klover automatically withdraws the advanced amount from the users' account. This is commonly referred to as an Earned Wage Access ("EWA") advance.

4. However, users do not just pay back the amount borrowed. They are also responsible for repaying various finance charges, such as "tips" and express transfer fees.

5. Even though Klover advertises that it has "zero interest or late fees. Like, legit zero-zero," that is not true.[2] When these finance charges are included, Klover effectively institutes interest rates in the thousands. Plaintiff paid APRs ranging from 1,040 percent to 1,596 percent.

6. These astronomical interest rates violate the Truth in Lending Act and state usury laws. Additionally, the intentional misrepresentation of interest rates and fees associated with Klover's loans violates state consumer protection laws. Accordingly, Plaintiff, on behalf of herself and all others similarly situated brings claims against Klover Holdings, Inc. under the Truth in Lending Act 15 U.S.C. § 1601 *et seq.*; California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq*., California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500, *et seq*.; California Constitution, Article XV § 1; and unjust enrichment.

---

[1] https://www.joinklover.com/blog/how-to-make-ends-meet

[2] https://www.joinklover.com/ . This quote is taken from the first graphic users see when they log on to Klover's website.

7. In addition, Plaintiff brings declaratory judgment claims on behalf of all herself and all those similarly situated to invalidate Defendant's unconscionable and unenforceable so-called "arbitration" clause.

## THE PARTIES

8. Plaintiff Jaele Davis is a California resident. She has received advances from Defendant on multiple occasions, including March 25, 2026; April 17, 2026; and May 13, 2026. Plaintiff Davis paid express fees on these advances, and she used points accumulated in her Klover app to pay for tips to Defendant.

9. Defendant Klover Holdings, Inc. is a Delaware corporation and is headquartered in Chicago, Illinois.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

11. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the aggregate amount in controversy exceeds $5 million, exclusive of interests and costs; more than 100 class members are involved; and many members of the proposed Classes are citizens of different states than the Defendant.

12. This Court has personal jurisdiction over Defendant because it is headquartered in Chicago, Illinois, committed the tortious acts alleged herein in Illinois, regularly conducts business in this District, and has extensive contacts with this forum.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant resides in this District, a substantial part of the events or omissions giving rise to the claim occurred in this District, and Defendant transacts substantial business in this District.

## FACTUAL ALLEGATIONS

### A. Earned Wage Access vs. Payday Loan

14. Although Earned Wage Access ("EWA") platforms like Klover try to position themselves as separate and less predatory than payday loans, this is not true. They are essentially the same service with a different name.

15. EWA advances allow users to receive part of their paycheck before it is deposited into their bank account. Advances are based on the amount a user gets paid, so they typically do not exceed a user's paycheck amount.

16. With Klover, users can access money up to two weeks before their paycheck arrives, and funds can be deposited within minutes. This is particularly useful when users are presented with unexpected expenses, such as car repairs or medical bills.

17. When users do eventually get paid, Klover automatically withdraws the amount of the advance from the user's account.

18. Similar to EWA advances, payday loans are short-term loans that give users access to cash right when they need it, and they are meant to be repaid on the next payday.[3]

19. Payday loans are considered extremely predatory, as they often come with high interest rates of 400 percent or more.[4] Due to high interest rates, users of payday loans often get stuck in a cycle of borrowing, taking out additional loans to pay off the previous one.[5]

---

[3]Ronald J. Mann & Jim Hawkins, Just Until Payday, 54 UCLA L. REV. 855, 857 (2007) https://www.uclalawreview.org/wp-content/uploads/2019/09/26_54UCLALRev855April2007.pdf

[4] *Id.*

[5] Matthew Johnson, Earned Wage Access: A Loan By Another Name?, 20 NW. J.L & SOC. POL'Y 35, 46 (2024) https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1256&context=njlsp

20. Payday loans are a known danger to Americans' financial wellbeing. In fact, most states heavily regulate or prohibit payday lending to protect users from getting trapped in a cycle of debt that they cannot get out of.[6]

21. In theory, there are two big differences between payday loans and EWA advances. First, unlike EWA advances, payday loans are not necessarily dependent on how much a user earns, meaning users can borrow more than they will receive in their next paycheck. Second, payday loans charge very high interest rates while EWA advances purportedly charge no interest (but, as discussed below, this is not true).

**B. How Klover Works**

22. To get started, users download Klover's app.

23. Then they enter their bank account information. With this, Klover can confirm payday income and automatically withdraw money when users get paid. Klover can also evaluate earnings and determine the maximum value of a user's advance.

24. After entering this information, users can request their Klover Advance ("Advance").

25. Klover wants users to think the Advance process is easy and straightforward. But, unbeknownst to users, Klover's Advances come with strings attached.

26. Klover charges three fees that it does not obviously disclose to users prior to the Advance request process: (1) an express transfer fee; (2) a "tip"; and (3) a subscription fee.

**C. Klover's Express Fee**

27. On the app store, Klover advertises itself as "Klover – Instant Advance," claiming that users can "access up to $750 *instantly*" (emphasis original) and "pocket…cash in minutes":

[6] https://www.ncsl.org/financial-services/payday-lending-state-statutes


Klover - Instant Cash Advance
Up to $750 Before Payday
Update
368K RATINGS
4.8
AGE RATING
18+
Years
CHART
#39
Finance
What's New
Version 2026.11.0
1d ago
Bug fixes and improvements.
Preview


Update
Preview
Access up to $750* instantly
Cash Advance
450
Available funds, up to
$750
Automatically pay it back!
*Not all users will qualify. Advances range from $25 - $750, avg advances $170. Express transfer fees may apply.
iPhone
Your payday can't come soon enough! That's
Today
Games
Apps
Arcade
Search


Update
Your payday can't come soon enough! That's where we come in. Get a Klover cash advance up to $750* cash – even if your payday is 2 weeks away. And unlike banks, there are no late fees, credit checks or interest charges. Like, legit zero-zero.
HOW TO GET YOUR FIRST ADVANCE:
* Enter your name, email and phone to sign up in seconds
* Connect your bank so we know where to send your money
* Pocket your cash in minutes –– get up to $750*
But we're not just a one-trick pony. Here's why over 2 million people have made Klover their budget bestie:
SCORE EASY POINTS
Earn points for things like taking surveys and watching ads, then cash them out for a bigger advance.
BUDGET LIKE A BOSS
Level up your money game with Klover+ innovative budgeting tools. Create spend goals, opt-in to track your credit score, and earn extra points when you reach savings targets.
MONEY FROM THE FUTURE
It's not sci-fi, it's borrowing from yourself. Ditch the banks with high fees or your friends with high horses. Get a cash advance through the Klover app
Today
Games
Apps
Arcade
Search

28. Despite Klover's advertising, users cannot get instant access to their Advance without paying an additional express fee, ("Express Fee") and the amount of the Express Fee increases as the Advance gets larger. For instance, users must pay $3.99 to expedite a $25 Advance. To expedite a $300 Advance, they have to pay $19.99. For the maximum Advance amount of $750, the Express Fee is $37.49.[7]

29. The Express Fee is added to users' payback amount, and it is withdrawn from their bank account at the same time as the Advance. For example, if a user pays a $37.49 Express Fee to expedite their $750 Advance, their payback amount will be $787.49 (assuming they do not leave a "tip," as described below).

30. If users do not pay the Express Fee, the money can take up to three days to arrive in users' bank accounts.[8]

31. So, Klover tricks people into downloading its app under the false premise that they will be able to receive cash instantly. But, once users have downloaded the app and given Klover their information, they realize that the instant transfer is not accessible without additional payment.

32. As such, Klover does not allow every user to "access [money] instantly," as it advertises, thus making its marketing deceptive and misleading.

33. Moreover, Klover manipulates users into paying the Express Fee by using what the Federal Trade Commission (FTC) calls "dark patterns"—deceptive business practices designed to manipulate consumers into making choices they would not ordinarily make.[9]

---

[7] https://www.joinklover.com/pricing
[8] https://www.joinklover.com/blog/how-does-klover-work
[9] *See* FTC Staff Report, *Bringing Dark Patterns to Light* at 2 (Sept. 2022), available at https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.14.2022%20-%20FINAL.pdf

34. Klover uses a dark pattern known as "preselection" to coerce users into paying for the Express Fee transfer fee.

35. "Preselection" is when a company defaults to a recommendation that is good for the company but not necessarily for the consumer.[10]

36. Klover institutes preselection but defaulting to the Express Fee option rather than the standard speed option, as shown below:




[10] *Id.* at 25.

37. This tactic is effective because of what is known as the "endowment effect."

38. The endowment effect is a principle of behavioral psychology which says that "any tactic that makes us feel a sense of psychological ownership over a product can encourage us to spend more on it."[11]

39. The endowment effect can be explained by humans' aversion to loss: "Because of loss aversion, when we're faced with making a decision, we tend to focus more on what we lose than on what we gain. As a result, in general, we are biased to maintain the status quo, rather than shake things up and risk sustaining losses."[12]

40. As relevant here, by automatically preselecting the Express Fee, Defendants exploit the endowment effect by making consumers feel a sense of ownership over the fee and the instant transfer speed. As such, they are less inclined to unselect the fee because they do not want to risk losing something.

41. So, Klover misrepresents its Advances as "instant" to entice users into downloading their app. Once users download it, connect their bank information, and almost done requesting an Advance, Klover employs dark patterns to manipulate them into paying the Express Fee.

42. This set up of false advertising followed by consumer manipulation tactics constitutes unfair business practices that violate state consumer protection laws.

### D. Klover Manipulates Users into Leaving a "Tip"

43. In the process of requesting an Advance, Klover asks users to leave a "tip" with their transaction.

44. Users get nothing in return for the tip; it is simply a charge requested by Klover in exchange for the ability to receive an Advance.

---

[11] https://thedecisionlab.com/biases/endowment-effect
[12] *Id.*

45. Although a tip may appear superfluous, many EWA users end up leaving one.

46. A 2021 survey found that when tipping was an option, 73 percent of EWA transactions included a tip.[13]

47. This statistic is unsurprising when one considers how companies such as Klover manipulate consumers into leaving tips with their Advances.

48. Once again, Klover utilizes the dark pattern of preselection by automatically adding a tip to user's transactions. User then have opt out of the tip rather than opting in.

49. An example of the tip screen is below:




[13] https://dfpi.ca.gov/wp-content/uploads/sites/337/2023/03/2021-Earned-Wage-Access-Data-Findings-Cited-in-ISOR.pdf?emrc=08148f

50. Klover also blatantly attempts to guilt users into tipping by saying the money will help them "offer free products" and "approve more users."

51. Klover also asks users to tip "if [they] enjoy using [its] service."

52. So, Klover manipulates users into leaving a tip in exchange for receiving an Advance.

**E. Klover Manipulates Users into Paying a Monthly Membership Fee**

53. When users download the Klover app, they are immediately required to sign up for Klover and connect their bank account. They cannot access or view any content on the app until they create an account and submit this information.

54. After users enter this information, they are presented with one final screen before they can access the app's content and request an Advance: the Klover+ membership page.

55. Klover makes user sign up for a one-month free trial of Klover+, a monthly membership that gives users access to financial management tools in the Klover app.

56. This subscription renews automatically unless cancelled.

57. Users cannot request an Advance until they sign up for the free trial.

58. Forcing a user to sign up for a free trial in order to access Klover's services is another dark pattern known as "forced enrollment."[14]

59. As with all dark patterns, forced enrollment induces consumers to make decisions they otherwise may not have made. In this case, consumers would not have subscribed to Klover+, but for the requirement to sign up in order to access the Advances.

[14] *Bringing Dark Patterns to Light* at 24.

60. This model is profitable for Klover because surveys show that 74 percent of people with subscriptions forget about the monthly charges they pay for services.[15]

61. Moreover, for the large portion of users who do not cancel their subscription, this Klover+ fee becomes a part of the fees paid to Klover in exchange for access to an Advance.

62. So, Klover manipulates consumers by luring them in with the false promise of instant, interest-free Advances but then forces them to sign up for an automatically renewing subscription to access the product.

**F. Klover's Points System**

63. In order to access Klover's Advances, users must also sign up for Klover's points program.

64. Users can redeem their points in the Klover app.

65. Points can be used to cover the cost of an Express Fee or to increase the amount of an Advance.

66. But, when users increase the amount of an Advance using points, the points do not cover the amount of the Advance. The points simply give you the opportunity to access—and then repay—more money.

67. For example, on April 17, 2026, Plaintiff Davis requested an initial Advance of $25. Using her points, she was able to Advance an additional $10. When her paycheck came in, Plaintiff Davis was still responsible for repaying her entire $35 Advance.

68. Users can earn points by watching video ads in Klover's app, taking surveys, linking external third-party accounts to Klover, uploading receipts into the Klover app, and more.[16]

---

[15] https://www.crresearch.com/blog/subscription-service-statistics-and-costs/
[16] https://www.joinklover.com/points-program

69. Klover is able to collect a wide range of personal information about its users by enticing them through points, and then it sells this personal information for profit.

70. On its website, Klover openly admits as much (while also lying about not charging fees): "We believe every American has the right to financial freedom — and we can help them get there. We give you all the right tools, and take away the fees. **Instead, we leverage our customers' most valuable asset — their data.**"[17]

71. Klover's privacy policy details the invasiveness of the data collection and selling. Klover lists the following categories of data it "may have sold or shared…to and with…third parties":

- Identifiers.
- Payment Data.
- Commercial Data.
- Device/IP Data.
- Web Analytics.
- Consumer Demographic Data.
- Professional or Employment-Related Data.
- Geolocation Data.
- Inferences Drawn From Other Personal Information Collected.
- Other Identifying Information that [Users] Voluntarily Choose to Provide.
- Categories of Data Considered "Sensitive" Under the California Privacy Rights Act and the Virginia Consumer Data Protection Act.

72. If users opt out of Klover's points program, Klover can restrict their access to Klover's services or simply delete their accounts altogether.[18]

73. Also, if users request that Klover delete their data, Klover deletes their entire account.

[17] https://www.joinklover.com/about

[18] https://www.joinklover.com/points-program

74. Below is the email users receive when they request that Klover delete their data, noting that "based on the nature of our business, our product is only possible thanks to the data sharing component of our business.":

> Hello [redacted]
>
> Thank you for contacting us! We have received your privacy request associated with this email address at Klover.
>
> **Please note that if you requested "Delete my Data", "Do not Sell" or "Limit the Use of Sensitive Data", then your account will be deleted along with your data. Additionally, any points earned will be forfeited.** Unfortunately, based on the nature of our business, our product is only possible thanks to the data sharing component of our business.
>
> If you would like to proceed, please click the link below to verify your identity, and we will start processing your request.
>
> — Klover Team
>
> Confirm my Privacy Request
>
> Please note this link will expire within 7 days

75. So, users must give Klover their personal information in exchange for use of their product, meaning that Klover exploits users' desperation for quick cash to gain personal information and then sell it for profit.

## G. Klover's Fees Constitute Interest

76. Klover's fees constitute "interest" because they work to compensate Klover in exchange for the use of money.

77. Black's Law Dictionary defines "interest" as "[t]he compensation fixed by agreement…for the use of…money….esp., the amount owed to a lender in return for the use of borrowed money.—Also termed *finance charge*." (emphasis original) (12th ed. 2024).

78. First, Klover openly admits that it "earns revenue through express fees for expedited transfers and through Klover+ memberships."[19] So, the Express Fee and monthly membership costs serve to compensate Klover for their Advance services.

79. Second, the Express Fee and "tips" are fees paid in exchange for the use of an Advance.

80. Since there is no difference in cost to Klover between a standard transfer and an Express Fee transfer, the Express Fee does not cover the cost of the fast transfer of money. Instead, the fee is meant to compensate Klover for providing money virtually on demand.

81. Similarly, when users "tip" Klover, they get absolutely nothing in return. So, a tip is simply a way that users pay Klover for the opportunity to use its money.

82. Lastly, Klover's membership fee is a charge that users are required to sign up for in order to access Klover's services for the first time. For those who do not cancel the membership, the fee becomes payment to a lender in return for the opportunity to borrow money.

83. When users request an Advance through Klover, they are responsible for repaying the amount of the Advance, plus any Express Fee, tip, and/or monthly membership fee that they add on top of that.

84. For example, if a user requested an Advance of $150, the Express Fee would be $12.49.[20] If a user also chose to leave a modest ten percent tip, this would be an additional $15. Total fees on this transaction would come to $27.49. So, in exchange for a $150 Advance, a user would pay Klover $177.49.

[19] https://www.joinklover.com/faqs
[20] https://www.joinklover.com/pricing

85. If a user paid this Advance back in two weeks—the maximum amount of time allowed by Klover—this would be equivalent to ***477.8***% APR, a rate easily as high as predatory payday loans. If they paid this Advance back in a shorter time, for instance in five days, the APR would be ***1,337.85***%.[21]

86. Klover's fees constitute interest and, accordingly, high interest rates that violate state and federal laws. Just because Klover self-identifies as "interest free" does not mean it is true, much less that their fees are blessed by law.

87. In reality, Klover's fees render its Advances nothing more than predatory payday loans.

### H. Users Are Required to Repay Klover's Advances

88. Klover tries to differentiate itself from payday loans by telling users that their Advances are "non-recourse," or that Klover will not "send [the] account to a debt collector, report anything to a credit bureau, or take any legal action if a balance goes unpaid."[22]

89. While this may be true, this does not mean that Klover does not expect and enforce repayment of the money it Advances to users, just like payday lenders.

90. Klover has direct access to users' bank accounts, and the moment they get paid Klover withdraws the amount of the Advance.

91. Moreover, if a user doesn't have enough money in their account to repay their Advance, Klover will either even overdraft a user's account or deem them ineligible for future Advances until the current Advance is repaid.[23]

[21] https://www.omnicalculator.com/finance/payday-loan
[22] https://www.joinklover.com/faqs
[23] https://www.joinklover.com/blog/how-does-klover-work

92. So, it's not that Klover's platform is fundamentally different from a payday loan because it won't "send the account to a debt collector." It just happens that Klover has no need for legal recourse or debt collectors because they already have direct access to the user's bank account.

## I. Plaintiff Davis's Experience with Klover

93. Plaintiff Davis joined Klover in March 2026. She decided to use Klover specifically because it was advertised as interest free and because she thought she could receive cash instantly.

94. Plaintiff Davis has received an Advance through Klover eight times in the past year, and she has paid an Express Fee on at least four of these transactions.

95. Plaintiff has been a member of Klover+ since March 25, 2026.

96. The day she became a member, March 25, 2026, Plaintiff also first requested an Advance of $10. She paid an Express Fee of $3.59. So, her total payback amount was $13.59. Plaintiff repaid this Advance nine days later on April 3, 2026. The APR on this Advance was 1,455.94 percent.

97. Plaintiff requested another Advance of $25 on April 17, 2026. With her points earned in the Klover app, she was able to access an additional $10 for her advance. She paid an Express Fee for this advance. But, when users get an initial advance amount, and then request an additional advance by using points, they have to pay the Express Fee on each advance.

98. As such, Plaintiff paid a $3.75 Express Fee on her $25 advance, making her total payback amount $28.75. She also paid a $3.99 Express Fee on her $10 advance, making her payback amount $13.99. Plaintiff paid this Advance back in full two weeks later on May 1, 2026. As a result, the APR on the $25 Advance was about 391 percent. APR on the $10 Advance was about 1,040 percent.

99. On May 12, 2026, Plaintiff requested a $25 Advance and paid a $3.28 Express Fee. On May 13, 2026, Plaintiff paid $4.99 for a Klover+ membership. She paid back the Advance and

Express Fee—a total of $28.28—three days later on May 15, 2026. The APR on this Advance, including the Klover+ membership, was about 4,024 percent.

100. Plaintiff has also tipped using points earned through the Klover app.

**PLAINTIFF'S AND THE CLASS MEMBERS' CLAIMS ARE NOT SUBJECT TO ARBITRATION**

101. Defendant's Terms of Service (the "Terms") contain an unconscionable dispute resolution procedure that "is not arbitration as envisioned by the FAA[.]" *See Heckman v. Live Nation Entm't*, 120 F.4th 670, 690 (9th Cir. 2024). Nor do the Terms contain a "written provision . . . to settle by arbitration a controversy," under the FAA. *See* 9 U.S.C. § 2.

102. The Terms contain an unconscionable pre-dispute notice and informal dispute resolution process requirement before a claimant can file an arbitration. If Defendant challenges a claimant's compliance with these requirements, a claimant cannot file the arbitration. The requirements are thus written to allow Defendant considerable leeway and discretion to mount challenges to a claimant's compliance with the pre-dispute requirements, and delay any arbitration filing.

103. To even begin an arbitration, a claimant must send a detailed notice that far exceeds the requirements of Rule 8 or even filing an arbitration demand. In addition, the Terms prevent a claimant from sending a notice through a third party, without "evidence of [the third party's] authority to submit the notice." The terms do not require Defendant to submit any notice before Defendant proceeds with a claim against an individual.

104. Defendant also can prevent the arbitration from proceeding by arguing that a claimant's notice was insufficient. The requirements provide leeway for Defendant to do so, such as if "a description of the factual basis" of the claim is somehow insufficient, or if a claimant does not submit sufficient "documentation or evidence" with the notice.

105. Even if Defendant decides not to challenge a claimant's notice, the Terms then impose an unconscionable pre-dispute informal dispute conference. This mandates that a claimant "personally appear at and participate in the dispute resolution conference" before filing an arbitration. While a claimant may have counsel at the conference, the Terms state that the "conference must be individualized, such that a separate conference must be held for each complainant."

106. This provision deters claimants from retaining counsel with experience in these claims and who may be representing similar individuals against Defendant. Counsel cannot efficiently try to negotiate a settlement on behalf of all similarly situated clients, and each client must go to a conference individually for their claim to proceed. This provision thus may deter claimants from retaining counsel altogether. *See Pandolfi v. AviaGames, Inc.*, 2024 WL 4051754, at *11 (N.D. Cal. Sept. 4, 2024) ("where the individual claims are small (as consumer claims often are), it may be difficult to find an attorney who represents only a single or small number of similarly situated clients"), *aff'd*, No. 24-5817, 2025 WL 2463742 (9th Cir. Aug. 27, 2025).

107. The Terms' vague language about a claimant needing to "personally . . . participate in the conference personally" also allows Defendant to contend that a claimant has not sufficiently participated "personally" in any conference, thus preventing a claimant from moving forward to arbitration. The Terms do not describe what "personal" participation means, allowing Defendant open-ended discretion to argue that a claimant did not "personally" participate and thus prevent the claimant from filing an arbitration.

108. The Terms' requirement for "personal" participation in such conference is also void for violating ethics rules. This requirement infringes on a consumer's right to be represented by counsel and to rely on their counsel's expertise and skill.

109. At these conferences, Defendant's counsel—either directly, or by coaching Defendant's agents, indirectly—are impermissibly allowed to communicate with a represented party. More than that, the rules seem to require Defendant's counsel to do so: to "personally" participate in the conference, consumers must speak directly with Defendant's attorneys' or else Defendant's representatives (whose statements and guidance will obviously be directed by Defendant's counsel).

110. Cal. Prof. Rule 4.2(a) states that "a lawyer shall not communicate directly or indirectly about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer."

111. This prohibition is read broadly. It prohibits any communication to Claimants when "the content of the communication to be had with the opposing party originates with or is directed by the attorney[.]" *San Francisco Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 153 Cal. Rptr. 3d 583, 602 (Cal. App. 2013) (quoting Cal. St. Bar. Comm. Prof. Resp., CA Eth. Op. 1993-131). Under these rules, Defendant's counsel is also prohibited from, inter alia, "scripting the questions to be asked or statements to be made in the communications or otherwise using the client as a conduit for conveying to the represented opposing party words or thoughts originating with the attorney." *Id*.

112. On information and belief, Defendant's attorneys advised it to create this informal dispute resolution process, and has advised, or will advise, Defendant's representatives on the "questions to be asked or statements to be made" at such a conference.

113. Thus, the dispute resolution process violates the ethical rules described above. *See San Francisco Unified Sch. Dist.*, 153 Cal. Rptr. 3d at 602.

114. Nor is the requirement saved because the Terms allow a claimant's counsel to attend the conference. The fact remains that counsel may also not participate in the conference, but Defendant still requires the claimant to attend and "personally" participate—meaning that the Terms require a represented party to speak to Defendant's attorneys directly or indirectly through Defendant's representatives, who are coached on what questions to ask and what statements to make to a represented party. In other words, the Terms' process intentionally is designed to allow Defendant's attorneys to speak to a represented party in violation of ethics rules, even if a claimant's counsel attends the conference. Otherwise stated, it is not a claimant's counsel's obligation to attend the conference to keep Defendant's counsel from violating ethical rules; it is Defendant's obligation not to create this situation in the first place.

115. Even if a claimant can overcome these obstacles to finally file its arbitration demand, the Terms stack the deck yet again in Defendant's favor.

116. The Terms unconscionably limit Klover's liability to $1,000, and precludes recovery of a wide swath of damages. The Terms further immunize Klover for any liability regarding the use of information or data on the Klover platform.

117. The Terms also contain an unconscionable jury waiver and class action waiver.

118. Yet, notwithstanding the class action waiver, The Terms actually require consolidated arbitrations into a bellwether staging process under the Terms' "Mass Arbitration" protocol.

119. The Mass Arbitration protocol applies "when twenty-five (25) or more similar demands are asserted against Klover and where representation of the claimants is consistent or coordinated across the cases."

120. If the protocol applies, the Terms requires coordination and joint case management conferences and joint hearings before a "Process Arbitrator."

121. If the Process Arbitrator's proceedings are complete—which is not explained by the Terms—then the arbitrations proceed in a batching process.

122. In the first batch, only 10 arbitrations may proceed—five selected by Claimants counsel, and five selected by Defendant. After those are adjudicated, "Klover and all known claimants shall engage in a mediation. If the parties are unable to resolve the remaining cases in mediation, each side shall select another ten (10) cases (per side) to proceed on an individual basis as part of a second batching process." After the next set of 10, "Klover and all known claimants shall engage in a second mediation."

123. If the second mediation does not resolve all claims, then the remaining claimants or Defendant can "opt out of the arbitration." Thus, even if a claimant is able to comply with onerous pre-dispute notice and conference requirements and is allowed to file an arbitration claim, there is no guarantee that the claim would actually be arbitrated. After delaying the process by two bellwether rounds and mediation sessions, Klover can simply force the claim back to court.

124. Millions of individuals have used Klover.[24] So the Mass Arbitration protocol is likely to apply. *See Pandolfi*, 2024 WL 4051754, at *6 ("At the time of contract formation, it is predictable that a player could have a dispute with Avia based on a company policy that applies across-the-board to *all* players, as occurred here, and will be caught up by the bellwether provision.")

125. This batching process—i.e., a test process of up to 30 arbitrations followed by back to court" is not a "written provision . . . to settle by arbitration a controversy," under the FAA, *see*

[24] https://www.joinklover.com/about

9 U.S.C. § 2. Claimants do not, and cannot, know in advance whether their claims will proceed in arbitration, and it is unconscionable to force them to participate in this process when Defendant may later opt-out of arbitration and force claimants to pursue claims in court.

126. Moreover, the Terms mandate that a court have jurisdiction over the enforcement of the "Mass Arbitration" protocol. So if a claimant is already in arbitration and seeks to challenge the application of this protocol, the claimant has to return to court to do so.

127. This batched, bellwether dispute resolution process a "fair and efficient alternative to bilateral judicial proceedings" contemplated by the Federal Arbitration Act ("FAA"). *See Heckman*, 120 F.4th at 689; *see also id*. at 690-93 (Vandyke, J., concurring).

**CLASS ACTION ALLEGATIONS**

128. Plaintiff Davis brings this action on behalf of herself and on behalf of the following proposed Nationwide Class, initially defined as follows:

> All individuals in the United States who paid, using cash or points, a tip, an Express Fee, and/or a Klover+ membership fee when receiving an Advance through Klover.

129. Plaintiff Davis also brings this action on behalf of herself and on behalf of the following proposed California Subclass, initially defined as follows:

> All individuals in California who paid, using cash or points, a tip, an Express Fee, and/or a Klover+ membership fee when receiving an Advance through Klover.

130. Excluded from the proposed Classes are "covered members" and their dependents as defined under the Military Lending Act ("MLA") 10 U.S.C. §§ 987(i)(1)-(i)(2). Also excluded are Defendant and its parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest.

131. Plaintiff reserves the right to re-define any of the class definitions prior to class certification and after having the opportunity to conduct discovery.

132. The claims of all class members derive directly from a single course of conduct by the Defendant. Defendant has engaged and continues to engage in uniform and standardized conduct toward the putative class members. Defendant does not differentiate, in degree of care or candor, in its actions or inactions, or the content of its statements or omissions, among individual class members.

133. Certification of Plaintiff's claims is appropriate because Plaintiff can prove the elements of Plaintiff's claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

134. Accordingly, Plaintiff brings this lawsuit as a class action on Plaintiff's own behalf and on behalf of all other individuals similarly situated pursuant under Rule 23 of the Federal Rules of Civil Procedure. This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Rule 23.

135. Specifically, this action has been properly brought and may properly be maintained as a class action under Rule 23(a)(1-4), Rule 23(b)(1), (2), or (3), and/or Rule 23(c)(4) of the Federal Rules of Civil Procedure.

136. **Numerosity** (Fed. R. Civ. P. 23(a)(1)). The members of the proposed Classes are each so numerous that their individual joinder would be impracticable. While the exact number is not known at this time, it is generally ascertainable by appropriate discovery, and it is believed each Class includes many tens of thousands of members. The precise number of class members, and their addresses, are unknown to Plaintiff at this time but can be ascertained from Defendant's records.

137. **Ascertainability.** The Class is ascertainable because its members can be readily identified using business records, and other information kept by Defendant in the usual course of business and within its control. Plaintiff anticipates providing appropriate notice to the Class to be approved by the Court after class certification, or pursuant to court order.

138. **Commonality and Predominance** (Fed. R. Civ. P. 23(a)(2); 23(b)(3)). Common questions of law and fact exist as to all class members. These questions predominate over the questions affecting only individual class members. The common legal and factual questions include, without limitation:

(a) Whether Defendant's marketing claims about the Product are misleading to a reasonable consumer;

(b) Whether Defendant engaged in the conduct alleged in this Complaint;

(c) Whether Defendant violated the applicable statutes alleged herein;

(d) Whether Plaintiff and the class members are injured and harmed directly by Defendant's conduct;

(e) Whether Plaintiff and the class members are entitled to damages due to Defendant's conduct as alleged in this Complaint, and if so, in what amounts;

(f) Whether Plaintiff and the class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief as requested in this Complaint;

(g) Whether Plaintiff and the Classes are entitled to actual, compensatory, nominal, statutory, enhanced, and/or punitive damages;

(h) Whether Plaintiff and the Classes are entitled to injunctive, declaratory relief, or other equitable relief;

(i) Whether Plaintiff and the Classes are entitled to civil penalties; and

(j) Whether Plaintiff and the Classes are entitled to reasonable attorneys' fees and costs.

139. **Typicality of Claims** (Fed. R. Civ. P. 23(a)(3)). The claims of Plaintiff and the putative class members are based on the same legal theories and arise from the same unlawful and willful conduct of Defendant, resulting in the same injury to Plaintiff and the putative class members. Plaintiff and all class members are similarly affected by Defendant's wrongful conduct, were damaged in the same way, and seek the same relief. Plaintiff's interests coincide with, and are not antagonistic to, those of the other class members. Plaintiff has been damaged by the same wrongdoing set forth in this Complaint.

140. **Adequacy of Representation** (Fed. R. Civ. P. 23(a)(4)). Plaintiff is an adequate representative of the Classes because her interests do not conflict with the interests of the class members, and she have retained competent and experienced class counsel. Plaintiff and her counsel will fairly and adequately protect the interest of the class members.

141. **Superiority of a Class Action** (Fed. R. Civ. P. 23(b)(3)). A class action is superior to other available means for the fair and efficient adjudication of the claims of Plaintiff and class members. There is no special interest in class members individually controlling the prosecution of separate actions. The damages suffered by individual class members, while significant, are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. Further, it would be virtually impossible for the class members individually to redress effectively the wrongs done to them. And, even if class members themselves could afford such individual litigation, the court system could not, given the tens or even hundreds of thousands of cases that would need to be filed. Individualized litigation would also present a potential for inconsistent or contradictory judgments. Individualized litigation would increase the delay and expense to all parties and the court system, given the complex legal and

factual issues involved. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

142. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief** (Fed. R. Civ. P. 23(b)(1) and (2)). In the alternative, this action may properly be maintained as a class action, because:

(a) the prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudication with respect to individual class members, which would establish incompatible standards of conduct for Defendant; or

(b) the prosecution of separate actions by individual class members would create a risk of adjudications with respect to individual class members which would, as a practical matter, be dispositive of the interests of other class members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

(c) Defendant has acted or refused to act on grounds generally applicable to the Classes, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Classes as a whole.

## FIRST CAUSE OF ACTION

### Violations of Truth in Lending Act (“TILA”) 15 U.S.C. § 1601 *et seq.*
### (On Behalf of Plaintiff Davis and the Nationwide Class)

143. Plaintiff Davis incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

144. The purpose of TILA is “to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and

avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a).

145. Regulation Z, 12 C.F.R. 1026 *et seq*., is the federal rule that implemented TILA.

146. Klover is subject to TILA and Regulation Z disclosure requirements.

147. Klover Advances are "credit" within the meaning of § 1602(f).

148. Klover is a "creditor" within the meaning of § 1602(g).

149. Plaintiff Davis's and the class members' Advances qualify as "consumer credit" within the meaning of 15 U.S.C. § 1602(i).

150. Klover's tips, Express Fee, and memberships fees are "finance charges" within the meaning of § 1605(a).

151. Klover's Advances are closed-end credit plans because they do not fall under the open-end credit plans as defined by § 1602. An open-end credit plan is one where "the creditor reasonably contemplates repeated transactions, which prescribes the terms of such transactions, and which provides for a finance charge which may be computed from time to time on the outstanding unpaid balance."

152. Because Klover calculates finance charges only once on an Advance, not periodically or "from time to time on the outstanding unpaid balances," Klover's Advances are closed-end credit plans.

153. According to § 1605(a), a "finance charge" is "determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit."

154. Because Klover manipulates consumers into paying for tips, the Express Fee, and membership fees, they are all incident to the extension of credit. Thus, they are all finance charges.

155. TILA requires that creditors disclose many aspects of a consumer credit transaction to consumers. Klover does not make many of the required disclosures, such as those listed below:

- The "'amount financed,' using that term which shall be the amount of credit of which the consumer has actual use." 15 U.S.C. § 1638(a)(2)(A)
- "The 'finance charge,' not itemized, using that term." § 1638(a)(3)
- "The finance charge expressed as an 'annual percentage rate,' using that term" for applicable transactions. § 1638(a)(4)
- "The sum of the amount financed and the finance charge, which shall be termed the 'total of payments.' § 1638(a)(5)
- "Descriptive explanations of the terms "amount financed", "finance charge", "annual percentage rate", "total of payments", and "total sale price" as specified by the Bureau. § 1638(a)(8)
- "A statement indicating whether or not the consumer is entitled to a rebate of any finance charge upon refinancing or prepayment in full pursuant to acceleration or otherwise, if the obligation involves a precomputed finance charge. A statement indicating whether or not a penalty will be imposed in those same circumstances if the obligation involves a finance charge computed from time to time by application of a rate to the unpaid principal balance." § 1638(a)(11)
- "A statement that the consumer should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties." § 1638(a)(12)

156. By not including any of these required disclosures, Klover violates the Truth in Lending Act, 15 U.S.C. § 1601 *et seq*. and Regulation Z, 12 C.F.R. §§ 1026.17 and 1026.18.

157. Accordingly, pursuant to 15 U.S.C. § 1640, Plaintiff seeks actual damages, attorneys' fees and costs, and statutory damages up to $1,000,000 or one percent of Defendant's net worth, whichever is less.

## SECOND CAUSE OF ACTION

**Violations of California Unfair Competition Law ("UCL")**
**Cal. Bus. & Prof. Code §§ 17200, *et seq*.**
**(On Behalf of Plaintiff Davis and the California Subclass)**

158. Plaintiff Davis incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

159. California Business & Professions Code, sections 17200, *et seq.* (the "UCL") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

160. Defendant's false and misleading advertising claims regarding the Advances violate all three prongs—unlawful, unfair, and fraudulent—of the UCL.

161. First, Defendant's representations and omissions regarding the Advances are unlawful because they are misleading to a reasonable consumer and violate the TILA and California law, as alleged herein.

162. Second, Defendant's conduct violates the "unfair" prong of the UCL because Defendant's representations and omissions regarding the Advances are illegal, immoral, unscrupulous, and substantially injurious to consumers, and the negative impact on consumers outweighs any reasons, justifications, or motives for Defendant's conduct.

163. Third, Defendant's conduct violates the "fraudulent" prong of the UCL because Defendant's representations and omissions are likely to deceive members of the public.

164. Defendant represents the Advances as "instant" and having "no interest charges." In reality, the Advances take up to three days to appears in users bank accounts. Users can pay an Express Fee to expedite the transfer, but this additional fee combines with the tips and membership

fee to create extremely high APR for users. Thus, the "instant" representation and the "no interest charges" representation cannot both be true.

165. Moreover, even if a consumer does not choose to expedite their Advance, consumers are still manipulated into paying tips and a membership fee. These additional charges are the equivalent of an extremely high APR. As such, the "no interest charges" representation is not true.

166. Plaintiff Davis and the class members reasonably relied on Defendant's representations and omissions. The representations and omissions were material because a reasonable consumer would consider whether they would be manipulated into paying additional fees with their Advance—resulting in an extremely high APR on the Advance—to be an important factor in deciding whether to use Defendant's product. The representations and omissions were a substantial factor in Plaintiff's decision to request an Advance from Defendant.

167. As a direct and proximate result of Defendant's violations of the UCL, Plaintiff Davis and the California Subclass have suffered injury in fact and have lost money. Plaintiff and the California Subclass were manipulated into paying predatory rates on their Advances.

168. Absent Defendant's misrepresentations and omissions, Plaintiff Davis would not have used Defendant's Advance service.

169. Plaintiff Davis seeks relief for violations of the UCL in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole Plaintiff and the California Subclass. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages. Further, to obtain a full refund as damages, Plaintiff would have to show that the Advances and associated fees have no market value, whereas that showing is not required for restitution.

170. Plaintiff Davis also seeks injunctive relief in the form of an order enjoining Defendant from continuing to deceptively market the Advance services and manipulate consumers who use the Advance services. Injunctive relief is appropriate because Defendant continues to deceptively market the Advances as "interest free" when they actually come with extremely high APR rates once all additional fees are considered. Additionally, Defendant continues to utilize deceptive and manipulative practices to induce users into paying these additional fees. Plaintiff would like to use Defendant's Advance services in the future if she could have confidence regarding the truth of Defendant's marketing claims, but in the absence of injunctive relief she will be left to guess whether the claims are accurate or the manipulation has ceased. Injunctive relief is therefore necessary to prevent Defendant from continuing to engage in the unlawful conduct and to prevent future harm to Plaintiff and the California Subclass, which cannot be achieved through available legal remedies.

171. **Permanent public injunctive relief**. Plaintiff, acting as private attorney general, also seeks public injunctive relief to protect the general public from Defendant's conduct. Defendant's false advertising is ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff seeks a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein

172. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and class members seek a court order enjoining Defendants from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

173. Plaintiff brings this action as a private attorney general and to vindicate and enforce an important right affecting the public interest. Plaintiff and class members are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

**THIRD CAUSE OF ACTION**

**Violations of California False Advertising Law ("FAL")**
**Cal. Bus. & Prof. Code §§ 17500, *et seq*.**
**(On Behalf of Plaintiff Davis and the California Subclass)**

174. Plaintiff Davis incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

175. The False Advertising Law, codified at Cal. Bus. & Prof. Code section 17500, *et seq*., prohibits "unfair, deceptive, untrue or misleading advertising[.]"

176. The FAL prohibits not only advertising which is false, but also advertising which, although true, is either actually misleading or which has a capacity, likelihood, or tendency to deceive or confuse the public.

177. Defendant violated section 17500 when it advertised and marketed the Advances through the unfair, deceptive, and misleading representations and omissions disseminated to the public that the Advances are "instant" and have "no interest charges." In reality, the Advances take up to three days to appear in users bank accounts. Users can pay an Express Fee to expedite the transfer so the money appears on the same day as it is requested, but this additional fee combines with the tips and membership fee to create extremely high APR for users. Thus, the "instant" representation and the "no interest charges" representation cannot both be true.

178. Moreover, even if a consumer does not choose to expedite their Advance, consumers are still manipulated into paying tips and a membership fee. These additional charges are the equivalent of an extremely high APR. As such, the "no interest charges" representation is not true either.

179. Plaintiff Davis and the class members reasonably relied on Defendant's representations and omissions. The representations and omissions were material because a reasonable consumer would consider whether they would be manipulated into paying additional

fees with their Advance—resulting in an extremely high APR on the Advance—to be an important factor in deciding whether to use Defendant's product. The representations and omissions were a substantial factor in Plaintiff's decision to request a Advance from Defendant.

180. Plaintiff Davis and the California Subclass have suffered injury in fact and have lost money. Plaintiff and the California Subclass were manipulated into paying predatory rates on their Advances.

181. Absent Defendant's misrepresentations and omissions, Plaintiff Davis would not have used Defendant's Advance service.

182. Plaintiff Davis seeks relief for violations of the FAL in the form of restitution, and/or disgorgement of ill-gotten gains to compensate and make whole Plaintiff and the California Subclass. Restitution is appropriate because it is more certain, prompt, and efficient as compared to damages. Further, to obtain a full refund as damages, Plaintiff would have to show that the Advances and associated fees have no market value, whereas that showing is not required for restitution.

183. Plaintiff Davis also seeks injunctive relief in the form of an order enjoining Defendant from continuing to deceptively market the Advance services and manipulate consumers who use the Advance services. Injunctive relief is appropriate because Defendant continues to deceptively market the Advances as "interest free" when they actually come with extremely high APR rates once all additional fees are considered. Additionally, Defendant continues to utilize deceptive and manipulative practices to induce users into paying these additional fees. Plaintiff would like to use Defendant's Advance services in the future if she could have confidence regarding the truth of Defendant's marketing claims, but in the absence of injunctive relief she will be left to guess whether the claims are accurate or the manipulation has ceased. Injunctive relief is

therefore necessary to prevent Defendant from continuing to engage in the unlawful conduct and to prevent future harm to Plaintiff and the California Subclass, which cannot be achieved through available legal remedies.

184. **Permanent public injunctive relief.** Plaintiff, acting as private attorney general, also seeks public injunctive relief to protect the general public from Defendant's conduct. Defendant's false advertising is ongoing and will continue to harm the public absent a permanent public injunction. Accordingly, Plaintiff seeks a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein

185. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and class members seek a court order enjoining Defendants from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

186. Plaintiff brings this action as a private attorney general and to vindicate and enforce an important right affecting the public interest. Plaintiff and class members are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

## FOURTH CAUSE OF ACTION

### Violations of the California Constitution
### Article XV § 1
### (On Behalf of Plaintiff Davis and the California Subclass)

187. Plaintiff Davis incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

188. Article XV § 1 of the California Constitution outlines the state's usury law.

189. Article XV § 1states that "for any loan or forbearance of any money, goods, or things in action, if the money, goods, or things in action are for use primarily for personal, family, or household purposes, at a rate not exceeding 10 percent per annum."

190. This section also states, "No person, association, copartnership or corporation shall by charging any fee, bonus, commission, discount or other compensation receive from a borrower more than the interest authorized by this section upon any loan or forbearance of any money, goods or things in action."

191. Defendant has violated Article XV § 1 of the California Constitution by charging a "fee, bonus, commission, discount or other compensation" such that the interest rate per annum exceeds 10 percent.

192. When all compensation for an Advance is considered—including tips, Express Fee transfer fees, and membership fees—Defendant's interest per annum far exceeds 10 percent. In fact, Plaintiff Davis paid interest rates above 1000 percent on Advances with Klover.

193. Plaintiff and the class members seek relief from Defendant's violations of the California Constitution in the form of restitution of all unlawful interest paid to Defendant in violation of the California Constitution. In addition, pursuant to Cal. Civ. Code § 1916-3, Plaintiff and the class members seek treble damages of all amounts unlawfully paid to Defendant.

194. Plaintiff Davis also seeks injunctive relief in the form of an order enjoining Defendant from continuing to violate California's Constitution. Injunctive relief is appropriate because Defendant continues to charge interest rates above 10 percent on its transactions, in violation of the California Constitution. Injunctive relief is therefore necessary to prevent Defendant from continuing to engage in the unlawful conduct and to prevent future harm to Plaintiff and the California Subclass, which cannot be achieved through available legal remedies.

195. **Permanent public injunctive relief**. Plaintiff, acting as private attorney general, also seeks public injunctive relief to protect the general public from Defendant's conduct. Defendant's false advertising is ongoing and will continue to harm the public absent a permanent

public injunction. Accordingly, Plaintiff seeks a permanent injunction to enjoin Defendant from engaging in the misconduct alleged herein

196. Pursuant to Cal. Bus. & Prof. Code § 17203, Plaintiff and class members seek a court order enjoining Defendants from such future misconduct, and any other such orders that may be necessary to rectify the unlawful business practices of Defendant.

197. Plaintiff brings this action as a private attorney general and to vindicate and enforce an important right affecting the public interest. Plaintiff and class members are therefore entitled to an award of attorneys' fees under Code of Civil Proc. § 1021.5 for bringing this action.

**FIFTH CAUSE OF ACTION**

**Unjust Enrichment**
**(On Behalf of Plaintiff Davis and All Classes)**

198. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

199. Plaintiff and members of the Class conferred a tangible economic benefit on Defendant in the form of monetary payments for Advances, which were used based on the misleading advertising that the Advances were instant and charged no interest.

200. Defendant knowingly accepted and retained these financial benefits under circumstances that make such retention unjust. Defendant marketed Advances as "instant" and being "no…interest charges," claims that were false, misleading, and not substantiated by the actual Advance process.

201. Defendant was also unjustly enriched by the sale of users' private data. Defendant targets people who are in tight financial situations and tricks them into downloading the Klover app on the false premise that it is interest free and that the Advance is "instant."

202. Users have to sign up with Klover and give Defendant access to their information before they request an Advance—thus, before they realize that the Advance is not instant and not interest free.

203. So, Defendant lures users in with false advertising, does not give them the product as promised, and then profits off the information that users have to give up before they realize that the advertising is false.

204. It would be inequitable for Defendant to retain the profits from the sale of users' data as well as the assessment of exorbitant unlawful interest rates through Defendant's deceptively marketed Advance service, as the enrichment was obtained through false and misleading labeling and marketing, omissions of material fact, and a campaign designed to create the false impression that the Advance service provided benefits that it did not actually provide.

205. Defendant's conduct has therefore caused and is causing immediate and irreparable injury to Plaintiff and the class members and will continue to both damage Plaintiff and the class members and deceive the public unless enjoined by this Court.

**SIXTH CAUSE OF ACTION**

**Declaratory Judgment or Relief, Cal. Civ. Code § 1060, *et seq*.**
**(On Behalf of Plaintiff Davis and All Classes)**

206. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

207. Plaintiff brings this claim individually and on behalf of all class members of the California Subclass against Defendant.

208. Under California law, "[a]ny person interested under a written instrument…or under a contract, or who desires a declaration of his or her rights or duties with respect to another…may, in cases of an actual controversy relating to the legal rights and duties of the

respective parties," may maintain a complaint or cross complaint "for a declaration of his or her rights and duties." Furthermore, he or she "may ask for a declaration of rights or duties, either alone, or with other relief, and the court may make a binding declaration of these rights or duties, whether or not further relief is or could be claimed at the time." Cal. Civ. Code § 1060.

209. As described above, Defendant's Terms contain dispute resolution provisions and a purported arbitration clause that is substantively and procedurally unconscionable. This renders the clause unenforceable against Plaintiff and the class members.

210. An actual controversy of sufficient immediacy exists between the Plaintiff and the class members, on the one hand, and Defendant, on the other hand, concerning their respective rights and duties under the Terms. Plaintiff contends that the dispute resolution provisions and purported arbitration clause contained within the Terms are void and unenforceable. Defendant contends and acts as if these Terms have legal force.

211. Plaintiff seeks a judicial determination of rights and duties and a declaration or judgement that the dispute resolution provisions and purported arbitration clause contained in the Terms are void and unenforceable against Plaintiff the class members.

212. A judicial declaration would advise Plaintiff and the class members of their rights and would advise Defendant of its duties to Plaintiff and the class members other users regarding the resolution of disputes, specifically whether disputes could proceed in court or, alternatively, would have to go through the purported arbitration process described in Defendant's Terms.

213. Such a declaration would not only benefit Plaintiff and the class members, but would also inure for the benefit of the public at large. The Ninth Circuit has specifically held than an unconscionable arbitration clause is "contrary to" California's "fundamental policy" against enforcing such agreements. *E.g., Hoffman v. Citibank (South Dakota), N.A.*, 546 F.3d 1078, 1083

(9th Cir. 2008) (per curiam); *Douglas v. U.S. Dist. Court for Cent. Dist. of Cal.*, 495 F.3d 1062, 1067 (9th Cir. 2007) (per curiam). Moreover, Defendant's Terms violate California's public policy against allowing corporate actors to unilaterally impose exculpatory clauses into contracts of adhesion, *Discover Bank v. Superior Court*, 36 Cal.4th 148, 161 (2005) and, more broadly, violates "California's strong public policy to protect consumers against unfair and deceptive business practices," *see Doe 1 v. AOL LLC*, 552 F.3d 1077, 1084 (9th Cir. 2009), by insulating Defendant from consumer claims based on unfair practices, like those alleged here. See also McGill v. Citibank, N.A., 393 Cal.5th 945, 952 (2017) (articulating California's public policy against impediments to consumers' right to seek public injunctive relief under state law)

**SEVENTH CAUSE OF ACTION**

**Declaratory Judgment or Relief, 28 U.S.C. §§ 2201-2202, *et seq*.**
**(On Behalf of Plaintiff Davis and All Classes)**

214. Plaintiff incorporates by reference all allegations in this Complaint and restates them as if fully set forth herein.

215. Plaintiff brings this claim individually and on behalf of all class members against Defendant.

216. Under federal law, "[i]n a case of actual controversy within its jurisdiction, … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment and shall be reviewable as such." 28 U.S.C. § 2201; *see also* Fed. R. Civ. P. 57.

217. An actual controversy of sufficient immediacy exists between the Plaintiff and the class members, on the one hand, and Defendant, on the other hand, concerning their respective rights and duties under the Terms. Plaintiff contends that the dispute resolution provisions and

purported arbitration clause contained within the Terms are void and unenforceable. Defendant contends and acts as if these provisions have legal force.

218. Plaintiff seeks a judicial determination of rights and duties and a declaration or judgement that the dispute resolution provisions and purported arbitration clause contained in the Terms are void and unenforceable against them or against any class members.

219. A judicial declaration would advise Plaintiff and the class members users of their rights and would advise Defendant of its duties to Plaintiff and other users regarding the resolution of disputes, specifically whether disputes could proceed in court or, alternatively, would have to go through the arbitration process described in Defendant's Terms.

220. Such a declaration would not only benefit Plaintiff and the class members, but also would inure for the benefit of the public at large.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the proposed Classes, pray for relief and judgment against Defendant as follows:

A. certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as representatives of the Classes, and designating Plaintiff's counsel as Class Counsel;

B. awarding Plaintiff and the Classes compensatory damages and actual damages, trebled, in an amount exceeding $5,000,000, to be determined by proof;

C. awarding Plaintiff and the Classes appropriate relief, including actual and statutory damages;

D. awarding Plaintiff and the Classes exemplary and punitive damages;

E. awarding Plaintiff and the Classes civil penalties;

F. granting Plaintiff and the Classes declaratory and equitable relief, including restitution and disgorgement;

G. enjoining Defendant from continuing to engage in the wrongful acts and practices alleged herein;

H. awarding Plaintiff and the Classes the costs of prosecuting this action, including expert witness fees;

I. awarding Plaintiff and the Classes reasonable attorneys' fees and costs as allowable by law;

J. awarding pre-judgment and post-judgment interest; and

K. granting any other relief as this Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: September 1, 2026

Respectfully submitted,

*/s/ Raphael Janove*

Raphael Janove (IL Bar No. 6328523)
**JANOVE PLLC**
115 Broadway, 5th Floor
New York, NY 10005
(646) 347-3940
raphael@janove.law